IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville October 14, 2015

**STATE OF TENNESSEE v. WALTER H. WEBB**

**Appeal from the Criminal Court for Wilson County**
**No. 11CR16     David Earl Durham, Judge**

_____

**No. M2014-01929-CCA-R3-CD – Filed December 11, 2015**

_____

Defendant, Walter H. Webb, was convicted by a Wilson County jury of one count of aggravated burglary, one count of aggravated assault, four counts of aggravated domestic assault, one count of employing a firearm during the commission of a dangerous felony, and one count of aggravated cruelty to animals. The trial court sentenced Defendant to a total effective sentence of twenty years' incarceration. On appeal, Defendant argues that the trial court erred by failing to dismiss the charge of employing a firearm during the commission of a dangerous felony on the ground that it violated the protection against double jeopardy, that the State failed to prove the requisite mens rea for aggravated assault, and that the trial court erred in determining the length of Defendant's sentences and ordering that some of the sentences run consecutively. Upon our review of the record, we conclude that Defendant's convictions do not violate double jeopardy principles, that the evidence is sufficient to sustain Defendant's convictions, and that the trial court did not err in determining the length of Defendant's sentences. After de novo review of Defendant's consecutive sentences, we affirm the alignment of the sentences imposed by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Comer L. Donnell, District Public Defender, and Kelly A. Skeen and John Gholson, Assistant Public Defenders, for the appellant, Walter H. Webb.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Tom P. Thompson, District Attorney General; and Thomas Swink, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual and Procedural Background*

This is Defendant's direct appeal from his Wilson County convictions for one count of aggravated burglary, one count of aggravated assault, four counts of aggravated domestic assault, one count of employing a firearm during the commission of a dangerous felony, and one count of aggravated animal cruelty. Defendant was also charged with criminal impersonation, public intoxication, vandalism under $500, and a violation of an order of protection; these charges were nolle prosequied by the State before trial.

On July 3, 2012, Defendant filed a motion to dismiss count seven of the indictment, charging him with employing a firearm during the commission of a dangerous felony, on the ground that it violated double jeopardy principles. The trial court's order disposing of this motion does not appear in the technical record. However, the record reflects that the charge was submitted to the jury; thus, it stands to reason that the trial court denied the motion.

### *Trial*

Cindy Webb and Defendant divorced in 2009 after thirteen years of marriage, and she had primary custody of their three minor daughters.[1] In November 2010, Ms. Webb obtained an order of protection against Defendant because of threatening text and voice messages and because her daughters did not feel safe when they visited him. During their visits, Defendant would clean and wave his gun and discharge it outside. Ms. Webb told Defendant that their daughters would no longer visit him until he became sober because she was afraid of putting them in harm's way. Ms. Webb explained that Defendant had struggled with drug addiction in the past but had been sober for about ten years until he was prescribed medication at the veteran's hospital sometime before November 2010.

On November 24, 2010, the day before Thanksgiving, Ms. Webb and Defendant were scheduled to appear in court regarding the order of protection, but Defendant failed to appear. Later, Ms. Webb received several threatening text and voice messages, including one in which Defendant threatened to "cut [her] head off." Around 6:00 p.m., Defendant called the oldest daughter and threatened to kill himself, causing the oldest

---

[1] To protect the identity of the minor victims, and because they each have the same initials, we shall refer to them as "the oldest daughter," "the middle daughter," and "the youngest daughter." Additionally, the oldest daughter's friend, who was the alleged victim of the aggravated assault charge, was also a minor and will be referred to as "M.A." to protect her identity.

daughter to cry hysterically. Ms. Webb called Defendant twice to talk to him, but both times they began yelling at each other, so she hung up.

Around 9:30 that night, Ms. Webb was asleep on the couch in the living room. The oldest daughter was in her mother's bedroom using the laptop computer with the youngest daughter and her friend, M.A., while the middle daughter was in her room listening to music and talking to a friend on the phone. The oldest daughter heard knocking on the front door. She testified that she knew it was Defendant, her father, even though he identified himself as a member of the Sheriff's Department. The oldest daughter told the youngest daughter to wake their mother. The oldest daughter testified that she was afraid because Defendant was not supposed to be at the house because of the order of protection.

Because there was no peep hole on the front door, Ms. Webb went to the living room window and looked outside. Although she could not see him, Ms. Webb testified that she knew it was Defendant at the door. Ms. Webb told the youngest daughter, the oldest daughter, and M.A. to hide in a bathroom while she went to get the middle daughter. As Ms. Webb and the middle daughter ran to the bathroom, Ms. Webb tried to turn off as many lights as possible. While in the bathroom, the oldest daughter called 911 on her cellphone; a recording of the 911 call was played for the jury.

A few minutes after the knocking started, the girls could hear gunshots and started screaming. Ms. Webb instructed everyone to remain quiet. Defendant shot through the deadbolt on the front door and then entered the house. The door to the bathroom was cracked slightly open, so the girls could see Defendant when he walked by, carrying a rifle. Defendant entered the kitchen, and Ms. Webb counted his steps as he walked on the hardwood floor. Ms. Webb estimated that when she counted eight or nine steps, Defendant had reached the other side of the house, and she instructed the girls to run out the back door. They ran to a neighbor's house down the street.

Eric Kenney testified that he lived two houses down the street from the Webb family. Mr. Kenney testified that on the evening of November 24, 2010, he walked onto his back porch and was headed to the shed in his backyard when he heard five or six gunshots. Mr. Kenney turned in the direction of the gunshots and saw "this man" standing on his neighbor's front porch. The man was holding a rifle and kicking the front door. Mr. Kenney went inside to call 911 but could not find his phone. When Mr. Kenney stepped outside to check on the Webb house, he saw that the front door was wide open and knew that the man had entered the house. Mr. Kenney went back inside to continue his search for his phone. Mr. Kenney saw a car parked in front of his yard and knew it was the man's car. Mr. Kenney then saw the man walking down the driveway carrying the rifle. Mr. Kenney testified that he did not know the man on the porch personally but knew of him and had seen him at the neighbor's house three or four times

over a three-year period. Mr. Kenney identified Defendant as the man he saw on the porch with the rifle.

Deputy Daniel Fanning of the Wilson County Sheriff's Office testified that on November 24, 2010, he responded to a call regarding an unwanted person. On his way to the scene, dispatch reported gunshots were heard in the background. When Deputy Fanning arrived, he saw a subject walking westbound, away from the complainant's house. Deputy Fanning commanded the person to stop and show his hands, but the person refused and kept walking across the street toward a car. As the person began to open the car door, Deputy Fanning again ordered him to stop and show his hands, and this time the person complied. Deputy Fanning identified Defendant as the person he detained that night.

After handcuffing Defendant, Deputy Fanning went to the area where Defendant had been walking and found a .22 caliber rifle with a scope just a few feet off the road, approximately forty yards from where he had detained Defendant. Deputy Fanning asked Defendant where he was coming from, and Defendant said from his girlfriend's house in Carthage. Defendant did not respond when asked if he had walked from Carthage. When asked about the gun, Defendant denied knowledge of a gun. When shown the gun Deputy Fanning recovered, Defendant denied that it was his and claimed it was his girlfriend's gun.

Detective Chris Hodge of the Wilson County Sheriff's Department arrived and spoke to the deputies on the scene. A box of .22 caliber rounds was found on the floorboard of Defendant's vehicle. Detective Hodge found a spent .22 caliber shell casing on the front porch and another spent casing on the ground in front of the house. Detective Hodge observed eight or ten bullet holes circling the deadbolt on the front door. The deadbolt was hanging off the door and part of the door frame was busted. Detective Hodge testified that he could see straight into the kitchen from the front door. He observed that a round had hit the stove and another had hit the microwave and was embedded in the window above the kitchen sink.

The family returned to the home when the police told them it was safe to do so. The oldest daughter testified that she observed bullet holes in the front door, as well as in the stove, the cabinet under the sink, in the middle daughter's bedroom, in the bathroom, and two or three in the ceiling of her bedroom. The oldest daughter discovered the family dog, Bean, in the middle daughter's bedroom. Bean had been shot and killed and was lying in a pool of blood. There was blood all over the middle daughter's bed, wall, and dresser. Detective Hodge found a bullet on the bed and opined that Bean had been on the bed when he was shot. Bean was described as a very friendly dog who rarely barked. The girls became hysterical when the oldest daughter discovered the dog and had to leave the house.

Corporal Christopher Keys of the Wilson County Sheriff's Department was in charge of searching Defendant as he was being booked into the jail. Corporal Keys asked if Defendant had been in a fight or a car accident as a preliminary question for medical purposes, and Defendant responded "that he doesn't fight, he shoots m***** f*****s." Corporal Keys described Defendant as angry but denied that he seemed disoriented.

Special Agent Teri Arney, a forensic scientist with the Tennessee Bureau of Investigation, testified as an expert in the area of firearm forensics and examination. Agent Arney received four fired cartridge cases, a fired bullet, and a rifle. Agent Arney determined that the rifle, a Winchester Model 290, .22 long file caliber semi-automatic, was in normal operating condition with functional safety features. Agent Arney determined that the four cartridge cases and the projectile had been fired from the rifle.

After a *Momon* colloquy, Defendant elected not to testify. Defendant presented the testimony of Elaina Ryan, his business partner. Ms. Ryan testified that on November 19, 2010, she invited Defendant out for dinner to celebrate his birthday, but Defendant declined because he was "out of it." According to Ms. Ryan, Defendant sounded as if he was intoxicated. Ms. Ryan visited the Defendant's home on a later date and observed several prescription drug bottles on the counter.

Defendant also presented the testimony of Dr. Murray Wilton Smith, an expert in the field of internal medicine and addiction. In preparation for his testimony, Dr. Smith reviewed Defendant's neuropsychological evaluation, his treatment records from the veteran's hospital from July 2000 to November 2010, a police report from Secaucus, New Jersey, dated October 22, 2010, and Defendant's jail medical records. Dr. Smith also conducted two clinical interviews with Defendant in February 2012. He also spoke to Ms. Ryan and Defendant's brother, Joe Webb. He testified that he did not interview Ms. Webb because she did not have pertinent information about what Defendant was experiencing at the time of the incident. However, he did review voicemail messages Defendant left for Ms. Webb in November 2010.

Dr. Smith testified that Defendant struggled with addiction to narcotics most of his life. Dr. Smith testified that from 2000 to 2009, Defendant was sober until he was inappropriately prescribed temazepam, a benzodiazepine, while at the veteran's hospital. The temazepam triggered Defendant's craving for both it and alcohol. By July 2010, Defendant suffered a full relapse which consisted not only of temazepam but alcohol, marijuana, Xanax, Valium, and cocaine. Defendant continued to be prescribed temazepam by the veteran's hospital, despite his reporting that he was using more than he should. Dr. Smith testified that Defendant's recovery was complicated by severe food poisoning from eating leftover pizza in October 2010, catching the flu on his birthday, preexisting brain damage from a motorcycle accident twenty years prior, and low oxygen

flow to the brain from years of chronic smoking. Defendant told Dr. Smith that he remembered nothing of the incident. Dr. Smith testified that Defendant's failure to recall the crimes is consistent with a person taking the kind of medication he was taking at the time of the crimes. Dr. Smith also testified that the area of Defendant's brain associated with judgment was not functioning properly.

The jury convicted Defendant as charged of one count of aggravated burglary, one count of aggravated assault, four counts of aggravated domestic assault, one count of employing a firearm during the commission of a dangerous felony, and one count of aggravated animal cruelty.

*Sentencing Hearing*

On September 10, 2012, the trial court held a sentencing hearing. Thomas Ray Coburn, a State Probation Parole Officer, testified that he was assigned to complete a presentence report on Defendant, which was admitted into evidence. Officer Coburn obtained information on Defendant's criminal history primarily from the Davidson County Criminal Court Clerk and NCIC. In addition to the unresolved robbery case in New Jersey, Defendant's criminal history included convictions for possession of drug paraphernalia, violation of the implied consent law, disorderly conduct, and driving under the influence. Officer Coburn acknowledged that there were no certified copies of judgments before the trial court.

The presentence report reflected that the fifty-year-old Defendant had completed high school and some college. Defendant was in the Navy from 1980 until 1983 and was discharged "under honorable conditions." Defendant had participated in three or four drug treatment programs in the mid-80s. Defendant was self-employed in the entertainment industry as a disk jockey and tour bus driver, and he also had his real estate license. Defendant reported that he did not remember anything that happened on November 24, 2010.

The oldest daughter testified that she was currently a senior in high school. She testified that "I don't need my dad in jail for forever because he's missing everything." She stated that everyone makes mistakes and "just because he did this doesn't mean that he's bad." She testified that she was not afraid of Defendant, that he wouldn't hurt her, and that "what happened that night was not my dad." The middle daughter also testified "that wasn't my dad that came in that night." She testified that she was not afraid of Defendant and believes that he can get his life back together. Both girls testified that they want their dad to come home as soon as possible.

Defendant called George Snodgrass, his friend of twenty-six years. Mr. Snodgrass met Defendant through Narcotics Anonymous in 1986. Defendant was sober for a

majority of the twenty-six years that Mr. Snodgrass knew him. Mr. Snodgrass described Defendant as a hard worker and a family man. Mr. Snodgrass stated that the charges against Defendant were "totally out of character for the Walter Webb that I know." Mr. Snodgrass explained that because of the nature of addiction, many people relapse and bad things can happen.

Defendant then called Tony Cline, his friend of ten or twelve years. Mr. Cline used to drive a tour bus, which is how he met Defendant. Mr. Cline explained that they built their friendship on sharing pictures and stories of their families while out on the road. Mr. Cline described Defendant as a hard worker who loved his family and wanted to spend more time with them. Mr. Cline found it "very shocking" when he heard the charges against Defendant. Defendant also called Jerry Burnside, another tour bus driver he had known since 2006, who testified similarly.

The trial court found that Defendant was a Range I offender. The trial court found that Defendant had a history of criminal convictions and behavior in addition to those necessary to establish the appropriate range, in that he had four misdemeanor convictions. The trial court rejected as a mitigating factor that Defendant was suffering from a mental or physical condition that significantly reduced his culpability for the offense, since such a condition cannot be the result of voluntary intoxication. The trial court also rejected as a mitigating factor that the offense was committed under such unusual circumstances that it was unlikely that it was motivated by a sustained intent to violate the law. The trial court found that there was no credible proof that Defendant was suffering from a relapse of his addiction. The trial court found that the children were particularly vulnerable because of their age. The trial court found that Defendant treated Bean with exceptional cruelty and that the personal injuries inflicted upon Bean were particularly great. The trial court found that Defendant had no hesitation about committing a crime when the risk to human life was high.

The trial court sentenced Defendant as a Range I offender to six years each for aggravated burglary, aggravated assault, four counts of aggravated domestic assault, and employing a firearm during the commission of a dangerous felony and to two years as a Range I offender for aggravated animal cruelty. By operation of law, the sentence for employing a firearm during the commission of a dangerous felony was run consecutively to the conviction for the underlying felony, aggravated burglary. The trial court ordered the assault convictions to run concurrently to each other, but consecutively to the burglary and firearm convictions. The sentence for aggravated animal cruelty was also run consecutively, for a total effective sentence of twenty years' incarceration.

The judgments were entered on October 2, 2012. Defendant filed a timely motion for new trial, which was denied by the trial court on September 8, 2014. Defendant filed a timely notice of appeal.

*Analysis*

*I. Double Jeopardy*

Defendant argues that the trial court erred when it denied his motion to dismiss count seven, employment of a firearm during the commission of a dangerous felony, on the ground that it violated the constitutional protection against double jeopardy. According to Defendant, he received multiple punishments for the same offense in a single prosecution because the charge of employing a firearm during the commission of a dangerous felony punishes "the same conduct that is the main object of the entire indictment anyway, i.e., the one count of Aggravated Assault and the [four] counts of Aggravated Domestic Assault."

The record includes Defendant's motion to dismiss, which was filed on July 3, 2010. While the record does not include a transcript or written order by the trial court disposing of the motion, the record makes it clear that all charges, including count seven, were submitted to the jury. It is the duty of the appellant to prepare "a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). Additionally, Defendant did not include this issue in his motion for new trial. Thus, the State initially argues that this issue has been waived by Defendant.

However, a new trial is not the remedy for a double jeopardy error; instead, a reversal of the conviction and a dismissal of the relevant charge or a merger of the two counts that violate double jeopardy are the proper remedies. *See State v. Cole Woodard*, 2012 WL 4057266, at *4 (Tenn. Crim. App. Sept. 17, 2012) (citing *State v. Addison,* 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997)). Moreover, multiple convictions that violate double jeopardy constitute "plain error." *See* Tenn. R. App. P. 36(b) (stating that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal"); *State v. Epps,* 989 S.W.2d 742, 745 (Tenn. Crim. App. 1998) (finding, "as plain error, that the appellant's convictions for both theft and attempted theft violate principles of double jeopardy"). Consequently, we may address Defendant's double jeopardy issue on its merits, despite his failure to include in the record the trial court's ruling on the motion and his failure to include the issue in his motion for new trial. *See Cole Woodard*, 2012 WL 4057266, at *4.

Here, Defendant argues that the possessing or employing of a firearm is an essential element of the underlying dangerous felony as charged in count seven, to wit:

aggravated burglary.  Defendant argues in his brief that while the display of a deadly weapon is not a per se essential element of each and every aggravated burglary charge, a deadly weapon is a de facto essential element in this aggravated burglary charge because Defendant allegedly entered the habitation with the intent to commit an aggravated assault with a deadly weapon.  Defendant contends that his convictions for both aggravated burglary and possessing a firearm during the commission of a dangerous felony violates the constitutional protection against double jeopardy.  The State disagrees.

The Double Jeopardy Clause of both the United States and the Tennessee Constitutions guarantee that no person shall be twice put in jeopardy of life or limb for the same offense.  U.S. Const. amend. V; Tenn. Const. art. I, § 10.  The Double Jeopardy Clause provides three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense.  *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *abrogated on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)).  Whether multiple convictions violate double jeopardy principles is a mixed question of law and fact, which this Court will review de novo without any presumption of correctness.  *State v. Smith*, 436 S.W.3d 751, 766 (Tenn. 2014) (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)).

To determine whether multiple convictions actually punish the same offense, we must apply the two-pronged test laid out in *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  *See Smith*, 436 S.W.3d at 767; *Watkins*, 362 S.W.3d at 556.  "In a *Blockburger* analysis, our primary focus is whether the General Assembly expressed an intent to permit or preclude multiple punishments.  If either intent has been expressed, no further analysis is required."  *Smith*, 436 S.W.3d at 767 (internal citations omitted).  In other words, if the legislature clearly intended to permit multiple punishments, then a defendant's multiple convictions do not violate double jeopardy principles.  Similarly, if the legislature clearly intended to preclude multiple punishments, then a defendant's multiple convictions violate double jeopardy principles.  It is only when the legislature's intent is unclear that we apply the "same elements test" from *Blockburger*.  *Smith*, 436 S.W.3d at 767.

> Under this test, the first step is to determine whether the convictions arise from the same act or transaction.  The second step is to determine whether the elements of the offenses are the same.  If each offense contains an element that the other offense does not, the statutes do not violate double jeopardy.

*Id.*

Under Tennessee Code Annotated section 39-17-1324(b), it is an offense to employ a firearm during the commission of or attempt to commit a dangerous felony. Aggravated burglary is one of the statutorily enumerated dangerous felonies, whereas aggravated assault and aggravated domestic assault are not. *See* T.C.A. § 39-17-1324(i). Tennessee Code Annotated section 39-17-1324(c) addresses the possible encroachment of double jeopardy when the state elects to charge under this statute by providing, in pertinent part, as follows:

> A person may not be charged with a violation of subsection . . . (b) if possessing or employing a firearm is an essential element of the underlying dangerous felony as charged. In cases where possession or employing a firearm are elements of the charged offense, the state may elect to prosecute under a lesser offense wherein possession or employing a firearm is not an element of the offense.

This Court has reviewed and rejected similar double jeopardy challenges to the firearms statute. In *State v. Jeremiah Dawson*, a panel of this Court held that because carjacking was listed "as a dangerous felony for which a defendant could be prosecuted for employing a firearm," then "the legislature obviously intended for dual convictions and multiple punishment." No. W2010-02621-CCA-R3-CD, 2012 WL 1572214, at *7 (Tenn. Crim. App. May 2, 2012), *perm. app. denied* (Tenn. Sept. 20, 2012). Additionally, "the legislature's use of 'as charged' and 'charged offense' in Tennessee Code Annotated section 39-17-1324(c) convinces us that the legislature was authorizing, even encouraging, the State strategically to indict a defendant for both felonies." *Id.* Because the legislative intent to permit dual convictions is clear, no further double jeopardy analysis is required. The defendant in *Jeremiah Dawson* was charged with carjacking by means of force or intimidation, rather than by means of a deadly weapon; therefore, his conviction under the firearms statute did not violate double jeopardy principles nor did it contravene section 1324(c). *See also James Garrett v. State*, No. W2012-01994-CCA-R3-PC, 2014 WL 1410292, at *6 (Tenn. Crim. App. Apr. 10, 2014); *Oscar Thomas v. State*, No. W2012-01646-CCA-R3-PC, 2013 WL 5761398, at *5-8 (Tenn. Crim. App. June 28, 2013).

In this case, the underlying dangerous felony was aggravated burglary. A person commits aggravated burglary who, without the effective consent of the owner, "enters a habitation with the intent to commit a felony, theft or an assault." T.C.A. §39-14-402 and 403. The use of a firearm is not an essential element of an aggravated burglary. That a firearm may have been used by Defendant as part of his intent to commit an assault does not transform the use of the firearm into an essential element of the aggravated burglary. *See Oscar Thomas*, 2013 WL 5761398, at *8. Accordingly, Defendant's conviction of employing a firearm during the commission of a dangerous felony does not violate the protection against double jeopardy and does not contravene section 1324(c). Defendant's

argument is without merit, and the trial court did not commit plain error in denying the motion to dismiss.

## II. Sufficiency of the Evidence

Defendant argues that the evidence presented at trial was not sufficient to support his convictions. Specifically, Defendant argues that the State failed to prove that he knew that anyone was in the house that night and, therefore, he could not have intentionally or knowingly caused someone to reasonably fear imminent bodily injury. According to Defendant, because the State failed to prove the mens rea required for aggravated assault and aggravated domestic assault, then it also failed to prove that he committed aggravated burglary by entering the house with the intent to commit an assault. Consequently, Defendant claims the State failed to prove the underlying felony, aggravated burglary, supporting the conviction for employing a firearm during the commission of a dangerous felony. Defendant does not contest his conviction for aggravated animal cruelty. The State responds that the evidence is sufficient to support all of Defendant's convictions.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn.2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This standard of review applies whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Defendant was charged with the aggravated domestic assault of his ex-wife and his three school-aged daughters. *See* T.C.A. § 39-13-111(a)(1), (4). Defendant was also charged with the aggravated assault of his oldest daughter's friend and schoolmate, M.A. An aggravated assault occurs when a person "intentionally or knowingly commits an assault" that "involved the use or display of a deadly weapon." T.C.A. § 39-13-102(a)(1)(A). An assault occurs when a person "intentionally or knowingly causes another to reasonably fear imminent bodily injury." T.C.A. § 39-13-101(a)(2).

A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result. T.C.A. § 39-11-106(a)(18). A person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. T.C.A. § 39-11-106(a)(20). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id*.

Defendant relies on our supreme court's decision in *State v. Wilson*, 924 S.W.2d 648 (Tenn. 1996), for the proposition that if the State failed to prove that Defendant knew anyone was in the house at the time of the shooting, then it failed to carry its burden with respect to the mens rea for aggravated assault. In *Wilson*, the defendant fired a gun at a house from the passenger side of a vehicle as it drove by. The supreme court held that in order to support the defendant's convictions for aggravated assault, the State was required to prove "either that defendant shot into the [victims'] home (a) for the purpose of causing the victims to fear imminent bodily injury (intentionally) or that defendant was (b) aware that the shooting would cause the victims to fear imminent bodily injury (knowingly)." *Id*. at 651. The supreme court noted that "[n]o testimony pointed to any facts—lights, noises, or other signs—which would indicate to a passerby that the house was occupied." *Id*. at 652. One of the victims testified that he went to the front door just before the shooting, but he testified that he did not see the vehicle, and evidence indicated that the front door was closed at the time of the shooting. The supreme court reversed the defendant's convictions for aggravated assault on the ground that the State had failed to prove the required mens rea beyond a reasonable doubt.

This case is distinguishable from *Wilson* on several grounds. First, the incident occurred the night before Thanksgiving, when it would be reasonable to assume that a mother and her three young schoolchildren would be at home. Second, Defendant spoke to Ms. Webb on the phone twice just a few hours before the shooting, as well as sent several threatening text and voice messages, indicating that he knew she was home and intended to scare her. Third, rather than driving by in a vehicle, Defendant parked his vehicle, knocked on the front door, and tried to trick his way into the house by identifying himself as a member of law enforcement. Fourth, Ms. Webb testified that after she was awoken by one of the daughters, she ran around the house turning off as many lights as

possible. Finally, when Defendant began shooting his way into the house, at least one of the girls hiding in the bathroom screamed, and Ms. Webb instructed them to be quiet. From this evidence, a reasonable jury could infer that Defendant was at least aware that his intended target was present and that the house was occupied.

Defendant was also charged with aggravated burglary and employing a weapon during the commission of a dangerous felony. An aggravated burglary occurs when a person, without the consent of the owner of the property, enters a habitation and commits or attempts to commit a felony, theft, or assault. T.C.A. § 39-14-402(a)(3) and 403(a). A person is guilty of an offense when a person employs a firearm during the commission or attempted commission of a dangerous felony. T.C.A. § 39-17-1324(b). Aggravated burglary is defined as a dangerous felony under the statute. T.C.A. § 39-17-1324(i)(1)(H).

Defendant's contention with respect to these convictions hinges on his argument that he was not aware that anyone was inside the house that evening. According to Defendant, if he is not guilty of aggravated assault, then he cannot have intended to commit an assault as an element of aggravated burglary. Consequently, if Defendant is not guilty of aggravated burglary, then he cannot be guilty of employing a firearm during the commission of a dangerous felony, to wit aggravated burglary. However, because we have already rejected Defendant's contention with respect to the mens rea element of aggravated assault, we similarly reject his contention with respect to these convictions. Furthermore, it is not necessary for the State to prove Defendant actually committed an assault as an element of aggravated burglary. A reasonable jury could infer Defendant's intent to commit an assault from the evidence presented, including the threatening text and voice messages and the fact that he fired a gun into a house.

Defendant clearly did not have the consent of Ms. Webb to enter the house that night because she had just that day obtained a final order of protection against him. The Defendant employed a firearm to blast his way into the house. Defendant then made his way through the house, firing the rifle several more times. Ms. Webb and the four girls hid in a small bathroom until they could flee out the back door to safety. Defendant shot and killed the family dog, Bean, who by all accounts was a friendly dog. From the evidence presented, the evidence is more than sufficient to sustain Defendant's convictions for aggravated burglary, aggravated assault, four counts of aggravated domestic assault, employing a firearm during the commission of a dangerous felony, and aggravated animal cruelty.

### III. Sentencing

#### A. Length of Sentences

When an accused challenges the length, manner, or range of a sentence, this Court will review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013); *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. T.C.A. § 40-35-401, Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The trial court should impose a sentence that is "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1). When determining whether a sentence of incarceration would be appropriate, the trial court should consider if:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant;

T.C.A. § 40-35-103(1)(A)-(C). In addition, the principles of sentencing provide that the sentence should be no greater that that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. *See* T.C.A. § 40-35-103(2), (4). To provide meaningful appellate review, the trial court must state on the record its reasons for the sentence chosen. T.C.A. § 40-35-210(e).

Tennessee Code Annotated section 40-35-114 contains a non-exclusive list of enhancement factors. The weighing of both enhancement and mitigating factors is left to the trial court's sound discretion. We note that even a trial court's misapplication of an enhancement or mitigating factor in imposing a sentence will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. In addition, the trial court must also consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by

the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210; *see also Bise*, 380 S.W.3d at 697-98.

In this case, Defendant was sentenced to six years for each Class C felony—aggravated burglary, aggravated assault, and four counts of aggravated domestic assault—as well as two years for the Class E felony, aggravated animal cruelty. Defendant also received the statutorily mandated minimum sentence of six years for employing a firearm during the commission of a dangerous felony. Defendant received within-range sentences for each conviction. *See* T.C.A. § 40-35-112(a)(3), (5). The trial court stated its reasons on the record for its sentencing decision; therefore, the presumption of reasonableness standard applies.

Defendant challenges the trial court's application of several enhancement factors to his sentence. Specifically, Defendant argues that the trial court erred in finding that he has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, *see* T.C.A. § 40-35-114(1), because the State failed to provide certified copies of the judgments for each of his prior convictions. The presentence report was entered into evidence and, by statute, must contain the defendant's record of prior convictions. T.C.A. § 40-35-207(a)(4). Unless there is a showing that the report is based on unreliable sources or is inaccurate, the trial court is entitled to rely on the report in determining a defendant's sentence. T.C.A. § 40-35-210(b)(2). Furthermore, "[t]he facts relevant to sentencing need be established only 'by a preponderance of the evidence and not beyond a reasonable doubt.'" *State v. Cooper*, 336 S.W.3d 522, 524 (Tenn. 2011) (quoting *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000)). The trial court was entitled to rely on Defendant's prior misdemeanor convictions in the presentence report and correctly classified the unverified convictions as criminal behavior.

Defendant also argues that the trial court abused its discretion by defining Bean, the family dog, as a victim under enhancement factors (5) and (6). Specifically, the trial court found that Defendant treated Bean with exceptional cruelty during the commission of the offense and that the personal injuries inflicted upon Bean were particularly great. *See* T.C.A. § 40-35-114(5), (6). This Court has previously upheld the application of enhancement factors (5) and (6) to a defendant's conviction for attempted intentional killing of an animal, where the defendant stabbed a police dog ten times in the face, mouth, and chest. *State v. Kenneth Hayes*, No. W2010-00309-CCA-R3-CD, 2011 WL 3655130, at *8-10 (Tenn. Crim. App. Aug 19, 2011), *perm. app. denied* (Tenn. Jan. 16, 2015). This Court noted "that the cases cited involve human victims as opposed to animal victims, however, the legal analysis is relevant as to both human and animal

victims," and it found that the dog was a victim of the defendant's crime. *Id*. at \*8 n3. Therefore, we do not find that the trial court abused its discretion in considering Bean a victim of Defendant's crime of aggravated animal cruelty.

However, "proper application of enhancement factor (5) requires a finding of cruelty under the statute 'over and above' what is required to sustain a conviction for an offense." *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001). In other words, there must be evidence of "the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." *Id*. at 259 (internal quotation and citation omitted). "A person commits aggravated cruelty to animals when, with aggravated cruelty and with no justifiable purpose, the person intentionally kills or intentionally causes serious physical injury to a companion animal." T.C.A. § 39-14-212(a). In this case, Defendant shot Bean one time, killing him. While it is possible to commit aggravated animal cruelty without killing the animal, the fact that the animal died does not alone evince the infliction of pain or suffering for its own sake. Thus enhancement factor (5) does not apply to the facts of this case. However, under the standard set out in *Bise*, "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from" the Sentencing Act. *Bise*, 380 S.W.3d at 706. Therefore, Defendant is not entitled to relief.

## B. Consecutive Sentences

When a defendant has been convicted of multiple crimes, the trial court may order that the sentences be served consecutively if it finds by a preponderance of the evidence that the defendant qualifies under one of the following seven categories:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). Only one of these criteria needs to exist in order to support the imposition of consecutive sentencing. *Pollard*, 432 S.W.3d at 859-62. A trial court's decision to impose consecutive sentences is presumed reasonable and is reviewed by this Court for an abuse of discretion. *Id.* "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862 (citing Tenn. R. Crim. P. 32(c)(1)); *see also Bise*, 380 S.W.3d at 705. However, when the trial court "fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority." *Pollard*, 432 S.W.3d at 863-64.

In this case, the sentence for employing a firearm during the commission of a dangerous felony is statutorily required to run consecutively to the sentence for the underlying felony, aggravated burglary. The trial court ordered the sentences for aggravated domestic assault to run concurrently with the sentence for aggravated assault. The trial court, "using the same balancing test of enhancement factors versus mitigating factors," ordered that the sentences for aggravated assault and aggravated animal cruelty run consecutively to the sentences for aggravated burglary and employing a firearm during the commission of a dangerous felony, for a total effective sentence of twenty years. Despite discussing the consecutive sentencing statute, the trial court did not articulate which of the seven factors it applied in making its decision. *See* T.C.A. § 40-35-115(b).

The State argues that the trial court's reference to the enhancement factors advocated by the State indicated its finding that Defendant was a dangerous offender. *See* T.C.A. § 40-35-115(b)(4) ("The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high."). When consecutive sentencing is imposed based

upon the dangerous offender classification, the record must also demonstrate that the total sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts" by the defendant. *Pollard*, 432 S.W.3d at 863; *see State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). "The need for the additional findings before imposing consecutive sentencing on the basis of the 'dangerous offender' provision arises, in part, from the fact that this category 'is the most subjective and hardest to apply.'" *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999)).

The trial court in this case did not make any findings with regard to the dangerous offender category or any of the other categories for imposing consecutive sentences. The trial court discussed at length the various enhancement and mitigating factors it either applied or rejected; however, enhancement and mitigating factors apply to the length of the sentence, not whether it should run concurrently or consecutively. In this situation, we have two options: "(1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." *Pollard*, 432 S.W.3d at 864. Since we have fully reviewed this record and made ourselves aware of the underlying facts found by the jury and trial court, and for reasons of judicial economy,[2] we choose the former option and conduct a de novo review.

Presented is a father who attempts to use subterfuge, claiming to be a member of the Sheriff's Department, to enter a home that he knows to be occupied by his three minor daughters and their mother. This is the same mother whose head Defendant had previously threatened to cut off. Defendant was the subject of an existing order of protection preventing him from coming around Ms. Webb and his three minor daughters. With this as a backdrop, Defendant blows open the front door of the home with a rifle, recklessly firing eight to ten shots which ricocheted about the house while his children, their mother, and one unrelated minor hid in fear for their lives. To add to this unthinkable trauma, Defendant callously executed the children's dog and sadistically left the dead animal on his minor daughter's bed for the child to find. This conduct is particularly shocking and malignant. Then, after fleeing the scene, Defendant lies to law enforcement officers regarding where he had been and his ownership of the weapon. Later, he told the booking officer that he "doesn't fight, he shoots m***** f*****s."

At the sentencing hearing, Defendant presented no redeeming proof to militate in favor of lenity for himself. He established his addiction to prescription drugs, with three or four attempts at treatment. The trial court expressed its concern that the present case indicated that Defendant is prone to violence during a relapse from his addiction, with future relapses always being a possibility. Based on the facts and circumstances, we

---

[2] The trial judge, the Honorable David Earl Durham, retired in August of 2014.

conclude that Defendant is a dangerous offender whose behavior indicates little or no regard for human life, and he had no hesitation about committing crimes in which the risk to human life was high. The sentence imposed by the trial court is reasonably related to the severity of the offenses and is necessary in order to protect the public from further criminal acts by Defendant. *Pollard,* 432 S.W.3d at 863; *Wilkerson*, 905 S.W.2d at 939. After de novo review, we conclude that the consecutive sentences imposed by the trial court are merited.

## *Conclusion*

Based on the foregoing, we affirm Defendant's convictions for aggravated burglary, aggravated assault, four counts of aggravated domestic assault, employing a firearm during the commission of a dangerous felony, and aggravated animal cruelty. We also affirm the length of the sentences imposed by the trial court in each case. Further, after de novo review, we affirm the partial consecutive alignment as imposed by the trial court.

_____
TIMOTHY L. EASTER, JUDGE